**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
------------------------------------------------------------------ X

SAMUEL YANNI,

                 Plaintiff,

v.

                                        **COMPLAINT**

THE CITY OF TITUSVILLE; THE TITUSVILLE
POLICE DEPARTMENT; OFC. CHRISTOPHER        **Jury Trial Demanded**
WOOD; OFC. CARLY ROSAS; OFC. WILLIAM
MICK; OFC. JOSHUA PAYNE; OFC. MATTHEW
RASMUSSEN; and, SGT. BRYAN NELSON

                 Defendants.

------------------------------------------------------------------ X

## **COMPLAINT**

Plaintiff SAMUEL YANNI (hereinafter "MR. YANNI" or "PLAINTIFF"), by

his attorneys, THE ASHMORE FIRM PLLC, for his Complaint against Defendants

the CITY OF TITUSVILLE (hereinafter "TITUSVILLE" or "the CITY"), the

TITUSVILLE POLICE DEPARTMENT (hereinafter "TPD"), OFC.

CHRISTOPHER WOOD (hereinafter "WOOD"), OFC. CARLY ROSAS

(hereinafter "ROSAS"), OFC. WILLIAM MICK (hereinafter "MICK"), OFC.

JOSHUA PAYNE (hereinafter "PAYNE"), OFC. MATTHEW RASMUSSEN

(hereinafter "RASMUSSEN"), and SGT. BRYAN NELSON (hereinafter

"NELSON"), states as follows:

## PRELIMINARY STATEMENT

1.      Pre-dawn, on November 24, 2021, MR. YANNI – an Egyptian-American and disabled United States Army veteran – arrived at the residence of Sarah Williams ("MS. WILLIAMS") and began to place happy-birthday lawn sign decorations on her front lawn, to celebrate her birthday.

2.      MR. YANNI and MS. WILLIAMS had previously dated, and when their intimate relationship ended, they remained friends, communicating and even dining together.

3.      In fact, MR. YANNI and MS. WILLIAMS had last dined together on October 6, 2021, before MR. YANNI left the United States for a religious mission trip to Croatia in late October through early November, and they had communicated by text message after his return to the United States in mid-November, shortly before MS. WILLIAM's November birthday.

4.      Nevertheless, MS. WILLIAMS, while observing MR. YANNI planting the birthday lawn signs in her front yard through her Ring Doorbell Video Camera and security cameras, called 911 and reported that an unknown individual was pounding on her house and door.

5.      When the defendant TPD police officers arrived on the scene, they arrested and handcuffed MR. YANNI without legal cause or justification.

6.     In the course of conducting on-the-scene interviews, the defendant TPD police officers failed to conduct an appropriate investigation, they disparaged MR. YANNI in their discussions captured by body-worn cameras, and discussed how they could drum-up enhanced charges against MR. YANNI after arresting him, as they eventually did.

7.     After arresting and jailing MR. YANNI, and continuing to inappropriately disparage him at the TPD station while he remained in custody, eventually all charges brought against MR. YANNI arising out of this incident were dismissed.

## ADMINISTRATIVE PROCEDURES

8.     Any and all prerequisites to the filing of this suit have been met, including the filing of MR. YANNI'S timely notice of claim pursuant to Fla Stat. §768.28(6)(a) (2023).

9.     On July 19, 2023, counsel for the City acknowledged receipt of MR. YANNI's Notice of Claim.

## JURISDICTION AND VENUE

10.     This civil rights action, seeking compensatory damages, punitive damages and attorney's fees and costs, is brought pursuant to 42 U.S.C. §§ 1983, 1985 and 1988, the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution, Article 1 of the Florida State Constitution, and Florida State Law, and under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

11.     Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343, and the aforementioned statutory and constitutional provisions.

12.     Plaintiff further invokes the pendent and supplemental jurisdiction of this Court under 28 U.S.C. § 1367 to hear and decide claims arising under state law.

13.     Venue is properly laid in this District under 28 U.S.C. § 1391(b), this being the District in which one or more of the defendants resides, and in which a substantial part of the events or omissions giving rise to the claims occurred.

## **PARTIES**

14.     Plaintiff SAMUEL YANNI, a permanent resident of Melbourne, Florida, is 48 years old.  Mr. Yanni was born and raised in Egypt before fleeing to the United States at age 19, and he is of middle-eastern descent.  He is also a one-hundred percent (100%) disabled United States Army veteran, who was medically retired from the Army in 2008 after sustaining serious combat injuries while deployed to Iraq during the Global War on Terror.

15.     Defendant CITY OF TITUSVILLE, is and was at all relevant times herein a municipal corporation duly organized and existing under the laws of the State of Florida.  The CITY maintained and operated the TITUSVILLE POLICE DEPARTMENT, which acted as the CITY's agent in the area of law enforcement and for which the CITY is and was ultimately responsible.  The CITY assumed the risks incidental to the maintenance of a police force and the employment of police

officers, as said risks attach to the public consumers of the services provided by defendant TPD.

16.     Defendant CHRISTOPHER WOOD is and was at all relevant times herein employed as a police officer by the defendant CITY, and was a duly appointed agent, servant and employee of the CITY and the TPD.  Defendant WOOD is being sued in his individual and official capacities.

17.     Defendant CARLY ROSAS is and was at all relevant times herein employed as a police officer by the defendant CITY, and was a duly appointed agent, servant and employee of the CITY and the TPD. Defendant ROSAS is being sued in his individual and official capacities.

18.     Defendant WILLIAM MICK is and was at all relevant times herein employed as a police officer by the defendant CITY, and was a duly appointed agent, servant and employee of the CITY and the TPD. Defendant MICK is being sued in his individual and official capacities.

19.     Defendant JOSHUA PAYNE is and was at all relevant times herein employed as a police officer by the defendant CITY, and was a duly appointed agent, servant and employee of the CITY and the TPD. Defendant PAYNE is being sued in his individual and official capacities.

20.     Defendant MATTHEW RASMUSSEN is and was at all relevant times herein employed as a police officer by the defendant CITY, and was a duly appointed

agent, servant and employee of the CITY and the TPD. Defendant RASMUSSEN is being sued in his individual and official capacities.

21.    Defendant BRYAN NELSON is and was at all relevant times herein employed as a police officer by the defendant CITY, and was a duly appointed agent, servant and employee of the CITY and the TPD. Defendant NELSON is being sued in his individual and official capacities.

22.    SARAH WILLIAMS was at all times relevant a resident of Titusville, Florida.  MS. WILLIAMS is 48 years old.  Upon information and belief, MS. WILLIAMS is of Caucasian descent.

## FACTS COMMON TO ALL CLAIMS

23.    MR. YANNI was born and raised in Egypt, in the Greek-Orthodox Coptic Christian faith.  After beginning his college studies in Cairo, and after facing religious persecution and imminent threats to his life from the Muslim Brotherhood, his family hastily relocated him to California at age 19, where he continued his college studies at Long Beach University.

24.    As an Arabic-speaking permanent United States resident, MR. YANNI was compelled by a sense of duty and patriotism following the 9-11 terrorist attacks on the United States, and as such, he enlisted in the United States Army in 2005, whereupon he was immediately deployed to combat operations in Iraq.  MR. YANNI was the "Distinguished Honor Graduate" of the Department of the Army's Echo

Company, 187<u>th</u> Ordnance Battalion, having graduated first in his class as a translator.

25.     During his combat deployment to Iraq, MR. YANNI sustained serious injuries, and after a year and a half hospitalization at Walter Reed National Military Medical Center, he was medically and honorably discharged from the United States Army in 2008.

26.     MR. YANNI has been designated as 100% disabled from his military service and injuries sustained in Iraq, and through the Veterans Administration ("VA"), obtained a service and support dog named Etta (hereinafter "ETTA").

27.     After recovering from the foregoing discussed combat injuries, *supra* at ¶25, MR. YANNI served in religions missions in Africa, Nigeria, the Congo, Zambia, and Kenya, followed by missionary work in southeast Asia for six years.

28.     While residing in Thailand, MR. YANNI enrolled in an aeronautical engineering program and he obtained a commercial pilot's license under the standards set forth and regulated by the International Civil Aviation Organization ("ICAO").

29.     In 2020, MR. YANNI returned to the United States and enrolled at the Florida Institute of Technology (hereinafter "FIT") to earn an aeronautical engineering degree, and to convert his ICAO pilot licensing and credentials to Federal Aviation Administration (hereinafter "FAA") and European Union Aviation

Safety Agency (hereinafter "EASA") credentials, that that will enable him to work as a cargo pilot in the United States and to serve as a volunteer commercial pilot abroad transporting individuals working in religious missions for the Mission Aviation Fellowship (hereinafter "MAF") organization.

30.     MR. YANNI's EASA and FAA pilot credentials require him to maintain security clearance credentials with the United States Transportation Security Administration (hereinafter "TSA").   Additionally, working and employment as a pilot requires extensive background checks and clearances.

31.     MR. YANNI used his GI-benefits earned during his Army service for his FIT education.

32.     In or about early October 2020, while enrolled as a student at FIT, MR. YANNI and MS. WILLIAMS met at a local Panera Bread café that both individuals regularly then used to study and work at remotely during the COVID-19 global health pandemic.

33.     At all times relevant, MR. YANNI resided in Melbourne, Florida, and MS. WILLIAMS resided in Titusville, Florida.

34.     After striking up a friendship, MR. YANNI and MS. WILLIAMS quickly began an intimate dating relationship.

35.     For approximately the next ten months, MR. YANNI and MS. WILLIAMS, frequently spent the night at each other's residences, took weekend vacations

together, MS. WILLIAMS introduced MR. YANNI to her adolescent, 17-year old daughter and a second adolescent who resided with MS. WILLIAMS; MR. YANNI also provided some financial support to MS. WILLIAMS during this period of time, and they even discussed moving in together into a home that MR. YANNI was planning to purchase, and did purchase.

36.     Upon information and belief, MS. WILLIAMS works as a counselor helping to train disabled individuals to work at limited-ability jobs, and she represented to MR. YANNI during their dating relationship that this was her profession.

37.     During their dating relationship, MR. YANNI understood that MS. WILLIAMS had a checkered past, including with substance abuse, but believed these issues were largely resolved.

38.     Upon information and belief, MS. WILLIAMS is also now surreptitiously engaged as a clandestine adult-images model, posting to social media under a pseudonym, and is at least also engaged as a biker magazine pin-up model.

39.     In August 2021, MR. YANNI travelled to Thailand as part of his academic studies and converting his ICAO credentials to FAA and EASA credentials.  Upon his return to the United States, MR. YANNI obtained a surgical procedure on August 30, 2021, at the Mayo Clinic, related to the injuries he sustained in Iraq.

40.     Approximately one week after this August 30 surgery, and while taking pain-killer narcotics prescribed after his surgery, and while dining at a restaurant with MS. WILLIAMS, MR. YANNI overdosed and was hospitalized.

41.     During the hospitalization resulting from this overdosing, MS. WILLIAMS visited MR. YANNI at the hospital, and cared for his service dog, ETTA, for a few days, until the organization which had trained and provided ETTA to MR. YANNI, was able to retake temporary custody of ETTA, while MR. YANNI recovered.

42.     After MR. YANNI was hospitalized, in or about early September 2021, MR. YANNI and MS. WILLIAMS ceased their intimate relationship – including because MR. YANNI determined and confirmed that MS. WILLIAMS had begun dating another individual – however they remained friends and continued communicating amicably as friends.

43.     For example, on September 29, 2021, MS. WILLIAMS sent MR. YANNI an email stating, *inter alia*, the following:

> I love to love. Love is beautiful.  Especially if the love is returned and appreciated.  Unfortunately, I did not feel like you returned my love or appreciated me.  But the moment you knew I wasn't returning, you grasped ahold as I was walking away.  *Maybe it will change, maybe it won't. Please don't hold your breath or wait for me.*

(*emphasis* added).

44.     On October 6, 2021 – which would have been their one-year dating anniversary – MR. YANNI and MS. WILLIAMS dined together at a local steak house.

45.     In early October 2021, and in light of his ongoing friendship and the foregoing communications and interactions with MS. WILLIAMS, MR. YANNI ordered several personalized "happy birthday" lawn sign decorations from a local printing shop in anticipation of MS. WILLIAMS upcoming November birthday.

46.     Despite the foregoing interactions and communications, which would continue electronically into late November, on October 18, 2021, MS. WILLIAMS filed a false and fabricated police report with the Melbourne Police Department (hereinafter the "October MPD Report"), alleging that MR. YANNI had confronted and yelled at her, and committed battery.

47.     To be clear, MR. YANNI did not meet with or speak to MS. WILLIAMS on October 18, 2021, or even know that she had filed the October MPD Report.

48.     In the October MPD Report, MS. WILLIAMS "stated she has never had any kind of romantic relationship with [MR. YANNI]."  This was a lie, and one month later when filing a report with the TPD, MS. WILLIAMS admitted she had been in a relationship (even though she later lied about the timing and duration of her relationship with MR. YANNI), see *infra* at ¶68.

49.     In the October MPD Report, MS. WILLIAMS stated that "[MR. YANNI] has been acting strange the last couple weeks and is seeking a relationship with her [and] stated that she has told [MR. YANNI] she does not want a relationship outside of being a friend."

50.     In the October MPD Report, MS. WILLIAMS stated that "she had just parked her car near the City Hall Parking Garage at approximately 1100 hours, when her friend, Samuel Yanni, pulled into the parking lot and parked beside her" further explaining that "Samuel quickly exited his vehicle while yelling at her" and that "during the argument Samuel grabbed her left wrist and pushed her up against her vehicle."

51.     When making the October MPD Report, MS. WILLIAMS expressly stated that she did not want "to pursue charges" and she signed a "declined to prosecute affidavit" and the October MPD report reflects that "this case is exceptionally cleared."

52.     On October 28, 2021, MR. YANNI traveled out of the United States to Croatia for a mission trip, and did not return to the United States until November 18, 2021.  However, immediately before departing to Croatia, MR. YANNI and MS. WILLIAMS continued to communicate on the telephone and by text messages.

53.     On November 24, 2021, in anticipation of MS. WILLIAM's forthcoming birthday, MR. YANNI travelled in the early morning hours to MS. WILLIAM's

home to plant the happy birthday lawn sign decorations he had earlier ordered, *supra* at ¶45 – as a birthday surprise to brighten her day – intending to plant the signs and leave a present on the porch before departing.

54.     When he arrived at MS. WILLIAM's home and began to quietly set up the lawn signs, his activities activated MS. WILLIAM's motion-detecting Ring Doorbell Camera, waking her, whereupon MS. WILLIAM dialed 911.

55.     During her six minute and twenty-five second call with the 911 operator, MS. WILLIAMS made the following statements to the 911 operator:

> ➢ After expressly acknowledging that she had "cameras outside" that she was using to observe the individual outside her home [MR. YANNI], and requesting that the police be dispatched to her home, she stated that someone was "outside beating on the door and the house."
>
> ➢ She represented that this purportedly unknown individual [MR. YANNI] had been at her home "about fifteen minutes" during which she had been observing him through her cameras.
>
> ➢ When asked by the 911 operator whether [MR. YANNI] was at her "front door or back door" MS. WILLIAMS stated "he is at my carport" which is located at the side of MS. WILLIAMS residence.
>
> ➢ Despite being asked a number of questions about what she was observing through her cameras by the 911 operator, MS. WILLIAMS

declined to mention any of the lawn signs that were clearly visible and which MR. YANNI had been planting.

➢ MS. WILLIAMS claimed that [MR. YANNI] had been outside her bedroom window, activating the cameras, and in response to the 911 operator's specific question about whether the adolescents in the home were also awake, MS. WILLIAMS stated that her daughter and the other girl residing in the home "did not know what was going on."

56.    Only after the police arrived on the scene, and while continuing to speak to the 911 operator, MS. WILLIAMS then professed to suddenly know who the individual on her front lawn was, stating, *inter alia*, that [MR. YANNI] was "my stalker" and – at the end of the 911 call – identified her "stalker" as MR. YANNI. Immediately before ending the 911 call, the 911 operator advised MS. WILLIAMS that she could step out to speak to the officers on the scene, or wait until they knocked on her residence door.

57.    Upon arriving at the scene, and before speaking with MS. WILLIAMS, TPD officers immediately cuffed and arrested MR. YANNI, despite that he posed no threat, and was not acting in a hostile or suspicious manner of any kind.

58.    After cuffing MR. YANNI and reading him his *Miranda* rights, a TPD officer then stated to MR. YANNI "alright man, what are you doing here?"

59.    MR. YANNI respectfully responded that he was there in connection with MS. WILLIAMS' forthcoming birthday, and that he was setting up the lawn decorations, clearly visible to the arresting officer, including several birthday balloons affixed to the mailbox just feet from the arresting officer.

60.    MR. YANNI further advised that he was "her ex" and in response to the officer's question "are you allowed to be here" responded that he was just on the front lawn.  He also denied banging on the house or windows, and explained that he and MS. WILLIAMS had dated about a year, identifying the "gifts" he had brought to the home, as they remained friends.

61.    After this limited questioning of MR. YANNI, the responding officer then left MR. YANNI to next interview MS. WILLIAMS, for the first time.

62.    When opening her front door upon the knock of the responding officers, and in response to their initial statement asking "do you recognize that gentlemen [MR. YANNI, then standing cuffed down in the street with the other responding officers]" MS. WILLIAMS immediately stated "yes I do, arrest him, he's been stalking me."

63.    Despite having expressly declined to press charges in Melbourne after filing her false October MPD Report – and specifically executing a decline to prosecute affidavit – MS. WILLIAMS falsely advised officers that she had an "active case"

against MR. YANNI for stalking, identifying that she had filed this "complaint" in October.

64.    However, none of the responding officers made any attempt to confirm the veracity of this false information, much less even question MR. YANNI about this alleged October incident in Melbourne, or confirm with the Melbourne authorities whether or not any active case was pending, or if any complaint had been filed.

65.    While MR. YANNI remained cuffed, at the street, with responding officers – and while other officers were interviewing MS. WILLIAMS – in response to challenging questions about why he had visited his "ex" so early in the morning for these purposes, MR. YANNI expressly and clearly explained that they had remained friends, in communication, and that there was "evidence" of this contact when he was asked whether he had any "text messages" to substantiate his claims.  However, the officers never asked to review any of this evidence.

66.    The body-worn camera video footage makes clear that at the outset of the arrest and ensuing investigation, the officers knew that MR. YANNI had placed the birthday lawn decorations at MS. WILLIAMS' home.  This footage includes several officers discussing their own disparaging personal opinions about the lawn decorations with MS. WILLIAMS, making comments like "this is ridiculous" and "this is insane" and "this is crazy" and that "at a minimum we have him for stalking."

67.     The body-worn camera video footage makes clear that the lawn decorations, including flamingos and pictures, were directly related to MS. WILLIAM's and MR. YANNI's ongoing relationship – including MS. WILLIAM's admission to the responding officers that "I love flamingos" – and MS. WILLIAM's admission that she had just communicated with MR. YANNI before this incident on social media, at least evidencing their ongoing contact.

68.     Despite having denied any dating or romantic relationship when filing the October MPD Report just a month earlier, *supra* at ¶48, MS. WILLIAMS made clear to the responding officers that she had in fact engaged in a romantic, dating relationship with MR. YANNI.

69.     However, MS. WILLIAMS falsely stated to the responding officers that she had dated MR. YANNI "last year" (i.e., 2020) when asked about the timing and duration of their relationship, and further admitted that she had been dating "someone else" for the "last eight months" – when in fact she and MR. YANNI had been dating and intimate at least through August 2021.

70.     Despite the foregoing, when one responding police officer eventually asked MS. WILLIAMS "do you want him to go to jail" she stated "yes."

71.     When eventually asked why she and MR. YANNI broke-up, MS. WILLIAMS only stated "because he is creepy" and that "he is really strange and I

didn't like how he treated me, he was very rude." MS WILLIAMS did not repeat the battery allegations she had made one month earlier in the October MPD Report.

72. The body-worn camera video footage makes clear that the responding officers were determined to violate MR. YANNI's rights from the outset, stating amongst themselves how they were "just mak[ing] it look like we are looking at stuff" while they walked around and discussed a scheme to "take" the arrest and drum up charges against MR. YANNI in lieu of (1) releasing MR. YANNI with a warning, and (2) directing the parties to resolve their issues, if necessary, as a civil matter.

73. During this conversation, the officers discuss how they could look up to see if MS. WILLIAMS had an "active" case for stalking against MR. YANNI in Melbourne, so that they could upgrade the charges to Trespass, or Burglary, or Burglary with Stalking. But they did not look up or make any inquiry into whether there even was an active case in Melbourne – which there was not – however the defendant officers nevertheless still upgraded the charges brought against MR. YANNI.

74. The body-worn camera video footage makes clear the responding officers' belief that MR. YANNI "at least was not a violent stalker" however they continued to keep him cuffed, and in custody.

75.     Without performing an adequate investigation, or confirming MS. WILLIAM's allegations, or what charges or case was pending in Melbourne, or even discussing the foregoing with MR. YANNI, the responding TPD officers brought MR. YANNI into custody, impounded his vehicle, and jailed him.

76.     After posting bond, and expending substantial costs to retain criminal counsel, the CITY dismissed all the charges against MR. YANNI.

77.     Subsequent to his arrest, jailing, and the dismissal of charges against him – and continuing to the present day – MR. YANNI, suffered substantial economic and emotional harms from the unlawful acts of the defendants.

## FEDERAL CLAIMS FOR RELIEF

78.     The acts and conduct described above deprived MR. YANNI of his rights:

　　　a.  not to be deprived of liberty without due process of law;

　　　b.  not to be subjected to excessive or unreasonable use of force;

　　　c.  to be free from unreasonable search and seizure of his person and property;

　　　d.  to be free from false arrest, imprisonment, and unjustified detention;

　　　e.  to speak and associate freely and to seek redress of grievances;

all in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and *Monell*.

79.     Each individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by the other defendant, but failed to intervene to prevent the unlawful conduct, despite having had a realistic opportunity to do so, thus violating plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

80.     Defendant CITY OF TITUSVILLE had an affirmative duty to train, supervise and discipline the defendant officers in the proper procedures and laws necessary to effectuate a lawful arrest incident to a crime, or upon probable evidence that a crime has been committed – and failed to meet this duty.

81.     As a result of the acts and conduct of the defendants complained of herein, plaintiff MR. YANNI has suffered deprivation of his liberty, physical injuries, pain and suffering, mental anguish and distress, emotional injuries, shock, fright, apprehension, embarrassment, humiliation, shame, indignity, damage to reputation, special damages, including but not limited to economic loss, and loss of enjoyment of life from the incident and its aftermath, some which injury and damages may be permanent.

82.     The acts and conduct of defendants complained of herein were intentional, wanton, willful and malicious, and in reckless disregard of plaintiff's constitutional rights, thus entitling him to punitive and exemplary damages.

## CLAIMS FOR RELIEF UNDER STATE LAW

83.     The allegations of the preceding paragraphs are incorporated by reference herein.

84.     The acts and conduct of the defendants complained of herein constitute:

    i.   assault (placing plaintiff in apprehension of imminent and harmful and offensive bodily contact);

    ii.  battery (making offensive physical contact with and handcuffing plaintiff without privilege or consent);

    iii. unlawful stop, detention and false arrest (stopping, detaining and arresting plaintiff without probable cause to believe that plaintiff had committed reckless endangerment or any other crime or offense, and without any warrant or authority to do so);

    iv.  unlawful search (conducting a search of plaintiff and his property reasonable suspicion or probable cause, privilege or consent);

    v.   negligence and gross negligence in training, hiring, supervision, discipline and retention of police officers;

all under the Constitution and Laws of the State of Florida.

85.     The acts and conduct of defendants complained of herein were intentional, wanton, willful and malicious, and in reckless disregard of plaintiff's rights, thus entitling him to punitive and exemplary damages.

86.     Defendant CITY OF TITUSVILLE is vicariously liable for the unlawful and tortuous actions of their agents, servants and employees, the individual defendants, under the doctrine of respondeat superior, as the individual defendants were on duty and acting within the scope of their employment when they engaged in those actions.

87.     Plaintiff timely and duly served upon, presented to, and filed with the defendant CITY a Notice of Claim setting forth all facts and information required under Fla Stat. §768.28(6)(a) (2023).

88.     More than six months have elapsed since the presentation of plaintiff's claims to the City but the defendant CITY has wholly neglected or refused to make an adjustment or payment thereof.

89.     This action was commenced within the applicable statute of limitations.

90.     Plaintiff has complied with all conditions precedent to maintaining this action.

WHEREFORE, Plaintiff SAMUEL YANNI prays that the Court enter judgment in his favor and against defendants for the following relief:

A.     An award of compensatory damages in an amount to be determined at trial;

B.     An award of punitive damages against, in amounts to be determined at trial;

C.      Prejudgment interest;

D.      An award of reasonable attorneys' fees and costs; and

E.      Such other and further relief as this Court may deem just and proper.

Dated:  Miami, Florida
       February 05, 2024                                     Respectfully submitted,

                                             /s/ Benjamin J. Ashmore Sr.
                                           Benjamin J. Ashmore Sr., Esq.
                                           (Bar No.: 1038154)

                                           THE ASHMORE FIRM PLLC

                                           1110 Brickell Ave, Ste 430
                                           Miami, Florida 33131

                                           420 Lexington Avenue, Suite 300
                                           New York, New York 10170

                                           (800) 955-0629
                                           Fax: (212) 656-1375
                                           Cell: (917) 750-9212
                                           ben.ashmore.sr@ashmore.law